University of Montana

# ScholarWorks at University of Montana

Graduate Student Theses, Dissertations, & Professional Papers

Graduate School

1992

# Carey Land Act in Montana

Bonnie S. Christensen
*The University of Montana*

Follow this and additional works at: https://scholarworks.umt.edu/etd

# Let us know how access to this document benefits you.

## Recommended Citation

Christensen, Bonnie S., "Carey Land Act in Montana" (1992). *Graduate Student Theses, Dissertations, & Professional Papers.* 8511.
https://scholarworks.umt.edu/etd/8511

This Thesis is brought to you for free and open access by the Graduate School at ScholarWorks at University of Montana. It has been accepted for inclusion in Graduate Student Theses, Dissertations, & Professional Papers by an authorized administrator of ScholarWorks at University of Montana. For more information, please contact scholarworks@mso.umt.edu.

APPENDIX A



# Maureen and Mike
# MANSFIELD LIBRARY

Copying allowed as provided under provisions
of the Fair Use Section of the U.S.
COPYRIGHT LAW, 1976.
Any copying for commercial purposes
or financial gain may be undertaken only
with the author's written consent.

University of
**Montana**

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

# THE CAREY LAND ACT IN MONTANA

By

Bonnie S. Christensen

B.A., University of Montana, 1989

Presented in partial fulfillment of the requirements

for the degree of

Master of Arts

University of Montana

1992

Approved by

_Chairman, Board of Examiners_

_Dean, Graduate School_

June 1, 1992
_Date_

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

APPENDIX A

UMI Number: EP39312

All rights reserved

INFORMATION TO ALL USERS
The quality of this reproduction is dependent upon the quality of the copy submitted.

In the unlikely event that the author did not send a complete manuscript
and there are missing pages, these will be noted. Also, if material had to be removed,
a note will indicate the deletion.



UMI EP39312

Published by ProQuest LLC (2013).  Copyright in the Dissertation held by the Author.

Microform Edition © ProQuest LLC.
All rights reserved. This work is protected against
unauthorized copying under Title 17, United States Code



ProQuest LLC.
789 East Eisenhower Parkway
P.O. Box 1346
Ann Arbor,  MI 48106 - 1346

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.

APPENDIX A

Christensen, Bonnie S., M.A., June 1991          History

The Carey Land Act in Montana  (99 pp.)

Director:  H. Duane Hampton    [signature]

   In response to pressure from irrigation advocates, the
U.S. Congress passed the Carey Land Act in 1894.  Intended
to promote the construction of irrigation projects in the
western states, the Carey Act offered up to one million
acres of federal land to each state that irrigated and
settled those lands.  In 1895, the Montana legislature
approved a law to administer the Carey Act in the state.
Through the Arid Land Grant Commission (1895-1903), and the
Carey Land Act Board (1903-1965), Montana created three
irrigation districts under the Carey Act and patented 92,000
acres from the federal government.
   The Billings Bench district near the city of Billings was
the first successful Carey project in the state.  In 1920,
the construction company transferred title of the Billings
Bench project to the water users on the over 13,000-acre
district.  The largest Carey project in the state, the
Valier district, covered 70,000 acres.  The other successful
project was the Big Timber district, located in Sweet Grass
County.  Private construction companies built all three
projects and made money by selling water rights on the land
purchased by settlers.
   Although it completed three successful projects, the Carey
Land Act Board (CLAB) suffered from lack of state funding
and found it difficult to attract investors for Carey
projects.  The lack of state stream-flow records to gauge
water availability for the projects also created problems
for the CLAB.  Overestimation of available water supplies
and underestimation of the high cost of constructing large
irrigation projects led to the bankruptcies of several
companies and made investors wary of Carey districts.
   Records of the Arid Land Grant Commission and the Carey
Land Act Board are located in the Montana State Archives at
the Montana Historical Society in Helena.  These records
include letters, financial statements, project reports,
minutes and engineering reports.  Much of the research
included in this paper is from these records.

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.  APPENDIX A

# TABLE OF CONTENTS

CHAPTER                                                          PAGE

   1.  "A SMALL OASIS IN A VAST SEMI-ARID PLAIN".....1

   2.  THE ARID LAND GRANT COMMISSION, 1895-1903... 11

   3.  THE CAREY LAND ACT BOARD, 1903-1965......... 41

   4.  CONCLUSION................................. 87

     APPENDIX I:    PROGRESS OF STATES UNDER THE
                 CAREY LAND ACT................ 93

     APPENDIX II:   MONTANA CAREY DISTRICTS....... 94

     APPENDIX III:  BILLINGS BENCH DISTRICT...... 95

     APPENDIX IV:  VALIER DISTRICT.............. 96

     BIBLIOGRAPHY................................ 97

Reproduced with permission of the copyright owner.  Further reproduction prohibited without permission.  APPENDIX A

Chapter 1

"a small oasis in a vast semi-arid plain"


The westward movement of settlers has characterized American history since the first Europeans landed in Virginia. Farmers, trappers, miners and adventurers moved west to find land, furs, gold and excitement. Individually, most were ordinary people who just wanted to find a better, or perhaps an easier, life. But, as a group, these pioneers, especially the farmers, took on a romantic aura for many Americans. They came to represent the best of America--they were virtuous, honest, hardworking, and carried the future of the nation on their sturdy backs. However far removed from reality, this Jeffersonian ideal of the yeoman farmer was eagerly adopted by reformers in the late 19th century who were searching for an antidote to the corruption and vice they found in American industrial society.

To many reformers of the Progressive Era, the continued creation of small farms equaled the preservation of American society. Americans "still believed that the family farm was

1

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

the foundation of a healthy economy and essential to the perpetuation of democratic institutions and civic responsibility."[1]    As Eastern cities became more crowded and crime ridden, reformers dreamt of moving the "surplus" population of the cities onto the wholesome land of the west where these people could tend the earth and live the simple, virtuous life of Thomas Jefferson's republican farmer.  But, by the 1880s the extension of the agricultural frontier was beginning to slow as farmers ventured into what had once been called "The Great American Desert."  Although cattle and sheep prospered in this region, farmers struggled.  In a land where rainfall averaged less than 20 inches per year, most forms of agriculture could not survive without irrigation.  Thus, for those who believed that the future of the United States depended on the continuation of the agricultural frontier into the semi-arid region west of the 100th meridian, irrigation became an obvious necessity.  Without irrigation, settlement of the western lands would stop; the mythical "safety valve" would close and the troubles of American cities would continue to escalate.

In addition to social reformers, the irrigation movement also attracted those who hoped to benefit materially from the Anglo settlement of the west.  Unlike the Progressives, who wanted to increase arable land to cure

---

[1] Donald Pisani, "Reclamation and Social Engineering in the Progressive Era," Agricultural History 57 (January 1983), p. 46-48.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

the social ills of the nation, boosters in the western states and territories wanted to construct irrigation projects to promote stable farms that would strengthen their local economies.   A successful irrigation project near a town could revitalize a community by bringing in new people and more money.  Irrigated farmland also created a more substantial tax base for the state.   Whether motivated by the vision of a utopia of small farmers or by greed, many western businessmen, politicians and farmers supported the development of irrigation systems in the region:

Individual farmers, private businesses and community groups constructed the first irrigation systems in the west. But, by the 1880s, irrigationists like William E. Smythe, publisher of Irrigation Age, and Elwood Meade, State Engineer of Wyoming, realized that private capital was not establishing enough reclamation projects.  Although private companies did build some canal systems in the hopes of achieving large returns, most of these projects were not successful.  The water in the projects was expensive, water users and water suppliers quarreled over prices, and many companies failed because they could not settle their lands quickly enough.  According to historian Richard White, by 1900 "90 percent of the private canal companies [were] in financial distress.  Most sold out, often on credit, to their water users.  Such financial failures did not

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

encourage further private investment in irrigation systems."[2]

In an attempt to help farmers, and in response to pressure from reformers and western leaders, Congress passed the Desert Land Act in 1877. This new act gave settlers the right to claim up to 640 acres of arid lands, which they could purchase for one dollar an acre after three years if they "improved" a portion of the land by conducting water to it. Designed to attract settlers, this law was more beneficial to ranchers who exploited its vague wording to add more land to their holdings.[3] Westerners who attempted to lure small farmers to their states and territories feared that if ranchers continued to expand their holdings, these states would become little more than cattle baronies without the stable, prosperous communities that yeoman farmers would create. Richard Roeder, in his study of the Progressive Era in Montana, found this desire to make farming more dominant expressed in Montana as well as in other states. "Montanans," he argued, "believed that the farm community would free them from a dependence upon grazing as well as mining...There existed a feeling that land was too valuable to use five acres to feed a cow and that a boundless and

---

[2]Richard White, "It's Your Misfortune and None of My Own": A History of the American West, (Norman and London: University of Oklahoma Press, 1991), p. 403.

[3]Paul W. Gates, History of Public Land Law Development, (Washington, D.C.: U.S. Government Printing Office, 1968), p. 638-641.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.

more stable prosperity would prevail when all arable and irrigable land was put into small farms."[4]

Representatives from the western states recognized that they needed more federal assistance to build the bigger irrigation projects necessary to water the vast acres of land not adjacent to a water source.  As the west experienced a series of droughts in the 1880s, irrigation advocates began to call for regional conferences to decide how to obtain the needed irrigation works.  In 1891 the First Irrigation Congress met in Salt Lake City to discuss a strategy for pursuing this goal.  At the conference, delegates from states and territories throughout the west adopted a resolution calling on the federal government to cede land to the states to finance irrigation.[5]  Federal cession would provide an incentive to develop irrigation projects because it could mean a great increase in the state's taxable land.  Cession was a half-way measure between direct federal aid, which many strongly opposed, and strictly private construction of irrigation systems.

Like other states and territories in the arid west, Montana had its own boosters and promoters who supported irrigation as a way to increase the population and prosperity of the state.  According to Richard Roeder,

---

[4]Richard Brown Roeder, "Montana in the Early Years of the Progressive Period," Unpublished Ph.D. Dissertation, University of Pennsylvania, 1971.  p. 86.

[5]Gates, p. 648.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

"There was common agreement that federal aid was essential to bringing about a greater future because private capital was not equal to the task of building the necessary canals and reservoirs to utilize the state's waters."[6]  Montanan Robert Sutherlin embraced this attitude toward irrigation. Editor of The Rocky Mountain Husbandman from 1875 to 1926, Sutherlin, like others of this time, firmly believed in the virtue of the yeoman farmer.  He argued that, because of the harsh climate, in order for farmers to succeed in Montana, they needed the security of irrigation.[7]  But large irrigation projects were expensive.  Most of the land that could be cheaply irrigated in the state had already been filed on by 1882.[8]  Many investors who might have been willing to gamble on irrigation projects believed they could make more money by simply grazing cattle and sheep upon the land.[9]  Large irrigation projects were beyond the scope of small farmers and private corporations, so Sutherlin, like other westerners, looked to the federal government for aid.[10]

---

[6]Roeder, p. 73.

[7]Frank R. Grant, "Embattled Voice for the Montana Farmers:  Robert Sutherlin's Rocky Mountain Husbandman," Unpublished Ph.D. Dissertation, University of Montana, p. 169.

[8]Grant, p. 173.

[9]Grant, p. 175

[10]Grant, p. 177

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

In response to pressure from irrigation supporters, the U.S. Congress passed the "Carey Land Act" on 18 August 1894. Under the Carey Act, which was named for Senator Joseph M. Carey of Wyoming who introduced the bill, the federal government agreed to grant up to one million acres of public land to each western state if the state would reclaim and settle that land within ten years. An essential part of the legislation involved settlement; the act specified that the states could sell Carey land in parcels no larger than 160 acres. Congress expressly sought to benefit farmers, not large ranchers or land speculators.

To apply for Carey land, the state first submitted maps and plans to show how reclamation would proceed on the specified area. If the federal government approved the plans, it then "segregated" the land and permitted the state to begin its reclamation work. After the state adequately "reclaimed" and settled the area, the federal government then granted the state a "patent" for the land, and officially transferred ownership to the state, which then sold the land to settlers. In later amendments to the Carey Act in 1896 and 1901, Congress allowed the Secretary of the Interior to issue patents when an "ample supply of water is actually furnished upon the land...without regard to settlement or cultivation," and extended the original 10-year deadline for reclamation; the state was given 10 years from the time of segregation approval to complete irrigation

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission.
APPENDIX A

and reclamation, but the Secretary of the Interior could extend this deadline at "his discretion".[11]  The state could build the irrigation system itself or contract with a construction company to do the work.

Many states did not take greater advantage of the Carey Act because the act did not provide any funds for the state. The Carey Act was really government-sponsored private reclamation, and, "Private capital had taken up and improved the most likely projects which did not require too large an investment and promised quick return in water rents or in accelerating land prices."[12]  The donation of federal land helped defray the cost of building Carey projects, but the act did not help states or companies with the money needed to start projects and maintain them until they drew in settlers who would pay for the systems.  Like other states, Montana found it difficult to attract investors willing to finance the construction of irrigation projects under the Carey Act since the act offered nothing in funding and no guarantee for the private investment.

Because most states could not take full advantage of the Carey Act due to the financial inadequacies of the legislation, irrigation supporters demanded more government

---

[11]State of Montana, Rules and Regulations of the Carey Land Act Board of the State of Montana, (Helena:  State Publishing Company, 1909), p. 3-5.  Robbins, Roy M., Our Landed Heritage:  The Public Domain, 1776-1936, (Lincoln: University of Nebraska Press, 1962), p. 328-329.

[12]Gates, p. 651.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

aid.   Under the Newlands Reclamation Act of 1902, Congress
provided the initial funds to build dams and canals;
settlers on the reclamation projects eventually repaid the
building expenses.   Since the government did not have to
satisfy investors, it did not have to worry about immediate
returns on the investment of constructing large projects.
The Congress had augmented the Carey Land Act with new and
better legislation that would create hundreds of irrigation
projects throughout the west.

    States continued to take advantage of the Carey Act,
however, well after it was "replaced" by the Newlands act.
In Montana, the Carey Land Act Board, created by the state
legislature to administer the act, continued to function
until 1965.  Although it sometimes took several decades for
the Montana board to complete its irrigation systems, three
projects were successful and provided irrigated land for
hundreds of farmers.   The Carey Land Act projects were not
as large as the federal projects in the state, but they did
demonstrate that private capital under state supervision
could construct substantial irrigation works.   Although the
Carey Land Act never fulfilled the grand dreams of the 19th
century irrigationists, it did satisfy some of these
promoters and reformers.

    When Sutherlin, the ardent irrigation supporter,
visited Montana's Valier project in 1917, he discovered, as
his biographer wrote, in that "embryonic irrigation

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A

community the symbol of his life's work.  'To the man who has devoted his life to the securing of water on the land in his dear loved Montana home...this great system is an indescribable joy,' he exclaimed.  His hopes were affirmed by a small oasis in a vast semi-arid plain."[13]

The "oasis" that so pleased Sutherlin was an irrigation project started and completed under the Carey Land Act of 1894.

---

[13]Grant, p. 421-22.

Reproduced with permission of the copyright owner. Further reproduction prohibited without permission. APPENDIX A